FILED

2021 Aug-12  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JULIANA DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-883-GMB |
| | ) | |
| JACKSON NATIONAL LIFE | ) | |
| INSURANCE COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the Motion for Summary Judgment filed by Defendants Jackson National Life Insurance Company ("JNL") and iptiQ Americas, Inc. ("iptiQ"). Doc. 32.  Defendants seek summary judgment in their favor on Plaintiff Juliana Dawson's claims arising from JNL's refusal to pay a death benefit claim on her deceased husband's life insurance policy.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 7.  After careful consideration of the parties' submissions and the applicable law, and for the reasons to follow, the court concludes that the motion for summary judgment is due to be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view

all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II.  FACTUAL BACKGROUND

In 1996, Midland Life Insurance Company issued a group term life insurance policy to a trust of participating financial institutions that allowed the banks' customers and their spouses to obtain certificates for individual life insurance. Colonial Bank was one of the participating financial institutions, and it offered the plan to its customers and their spouses. Doc. 33-1 at 38.  Through various mergers

and business arrangements, Defendant JNL became the owner of the policy in 2012 and Defendant iptiQ assumed responsibility for administering JNL's life insurance claims. Doc. 33-6 at 6; Doc. 42-5 at 3.  iptiQ is a wholly owned subsidiary of Swiss Re. Doc. 33-6 at 6.  NTTD served as the third-party administrator of Swiss Re's life insurance claims, including the one at issue here.[1] Doc. 33-6 at 7.  Employees of both iptiQ and NTTD were involved in the administration of the instant claim.

The policy language at issue states that a "Member's insurance under [the] Policy will terminate on the earliest of" three pertinent dates: (1) the "end of the last period for which premiums have been paid"; (2) the "next Premium Due Date following the date the Member attains age [70]"; and (3) the date the insured dies. Doc. 33-2 at 13.  Neither the policy nor the individual certificates identify the time of day on the termination date that the coverage ends. Doc. 33-1 at 45; Doc. 33-2 at 13; Doc. 33-6 at 17.

**A.    Mr. Dawson's Life Insurance Policy**

In 2000, Plaintiff Juliana Dawson was offered the opportunity to enroll in the Colonial Bank group term life insurance plan. Doc. 33-1 at 7 & 38.  Both Mrs. Dawson and her husband, James Dawson, elected to enroll in the plan. Doc. 33-1 at 7, 38 & 41.  On July 15, 2000, the Midland Life Insurance Company issued a life insurance policy to James Dawson with a death benefit of $100,000 and Mrs.

---

[1] Swiss Re and NTTD are not parties to this lawsuit.

Dawson as the beneficiary. Doc. 33-1 at 41 (reflecting $100,000 policy value); Doc. 33-2 at 9–20 (specimen insurance policy); Doc. 33-3 at 1 (reflecting effective date of policy).[2]

It is undisputed that Mr. Dawson paid his monthly premiums for the duration of the policy. Doc. 33-1 at 9–10; Doc. 33-6 at 11–12.  In fact, JNL automatically debited the premium payments from Mrs. Dawson's checking account each month. Doc. 33-6 at 18.  Although the premiums were due on the 15th day of each month (Doc. 33-6 at 16), bank records show that JNL drew the payments from Mrs. Dawson's account sometime between the 17th and the 20th of each month. Doc. 42-3 at 3–4.  The final payment was drawn on August 17, 2018. Doc. 33-2 at 3.

Mr. Dawson turned 70 years old on September 3, 2018. Doc. 33-6 at 59.  In accordance with the policy, JNL sent Mr. Dawson a letter stating that the policy would "expire on 09/15/2018 with no further benefits." Doc. 33-3 at 1.  The letter did not reference a conversion privilege to extend coverage. Doc. 33-3 at 1. According to JNL, the September 15, 2018 termination date was the "next premium due date following the date the Member attains age [70]" under the policy. Doc. 33-6 at 59.  Mr. Dawson died at 7:55 p.m. on September 15, 2018. Doc. 33-3 at 2.

---

[2] The summary judgment record does not contain the certificate of insurance or the policy issued to Mr. Dawson.  Instead, the record contains a specimen Midland Life insurance policy dated May 1, 1996. Doc. 33-2 at 9–20.  For purposes of summary judgment, the parties agree that the specimen policy's terms are identical to the terms of the policy issued to Mr. Dawson. Docs. 32 at 5 & 42 at 10.

**B.    Mrs. Dawson's Claim**

Following her husband's death, Mrs. Dawson could not locate a copy of his insurance policy. Doc. 42-3.  On October 23, 2018, Mrs. Dawson notified JNL of her husband's death, requested a claim packet, and stated that she intended to make a claim on the policy. Doc. 33-6 at 21–22 & 64.  The next day, Amanda TerMaat, a claims team leader employed by NTTD, sent an email to Denise Ratliff, an iptiQ Senior Claim Oversight Manager, and Renee McCarty, another iptiQ employee who administers claims for JNL, stating,

> The policy expired on the anniversary date following the insured's 70th birthday.  The insured died the same day that the policy expired.  I wanted to verify that we would pay this benefit as the insured would be covered until 12 midnight on 09/15/2018. . . . Please review and advise.

Doc. 33-6 at 68–69.  McCarty responded that they "would need to review the certified death certificate." Doc. 33-6 at 68.

Mrs. Dawson submitted her formal written claim on January 19, 2019. Doc. 33-4 at 14–16.

**C.    The Denial of the Claim**

Denise Ratliff made the decision to deny Mrs. Dawson's claim. Doc. 33-6 at 15.  Ratliff testified that she believed the policy expired at 12:01 a.m. on September 15, 2018, before Mr. Dawson died. Doc. 33-6 at 15–17.  According to Ratliff, Mr. Dawson's monthly premiums were due on the 15th day of each month, so the "next premium due date" after he turned 70 years old was September 15, 2018. Doc. 33-6

6

at 16–17.  The policy stated that it would terminate "on" that date. Doc. 33-2 at 13.

Ratliff interpreted this language to mean that coverage ended as soon as September

15, 2018 began. Doc. 33-6 at 16–17.

Ratliff did not consult with TerMaat regarding her decision. Doc. 33-6 at 19.

She also did not consult any legal resources or speak with a member of the legal

department in making her decision and interpreting the language of the insurance

contract. Doc. 33-6 at 18–19 & 35.  Ratliff did, however, review the claim file, policy

language, submitted claim requirements, and the date of death. Doc. 33-6 at 18.  She

also discussed the claim with McCarty. Doc. 33-6 at 19.

After receiving Ratliff's decision, McCarty instructed NTTD to draft a denial

letter for Mrs. Dawson. Doc. 33-6 at 67.  The original draft of the letter stated,

"According to our records, James attained age 70 on September 3, 2018 and the next

premium due date was September 15, 2018; therefore the policy terminated

September 15, 2018 and no benefit coverage is payable."[3] Doc. 42-4 at 7.  McCarty

received the draft letter and changed some of the language before mailing it to Mrs.

Dawson. Doc. 42-2 at 6.  At her deposition, McCarty could not remember the

specific language she edited (Doc. 42-2 at 6), but the final denial letter inserts the

phrase "as of" before the termination date. Doc. 42-4 at 2.  The final denial letter

---

[3] The record does not establish who drafted this initial letter.  The original draft was not in the claims file. Doc. 42-4 at 2.

reads as follows:

> Mr. Dawson's policy terminated September 15, 2018 with no benefits payable.
>
> [The policy] is a term life insurance policy with coverage to age 70. According to our records, Mr. Dawson attained age 70 on September 3, 2018 with premium paid to September 15, 2018. As outlined in our Term Expiry Notification letter of August 17, 2018 the policy terminated and coverage ended as of September 15, 2018.
>
> According to the policy contract under the Termination of Insurance . . . [a] Member's insurance under this policy will terminate on . . . [t]he next premium due date following the date the Member attains age (70).

Doc. 33-6 at 59. JNL sent the final denial letter to Mrs. Dawson on February 6, 2019. Doc. 33-6 at 59. McCarty testified that the policy language recited in the letter was the sole basis for the denial of the claim. Doc. 42-2 at 7.

**D.     The Lawsuit and Payment of the Claim**

On May 7, 2019, Mrs. Dawson filed a lawsuit against JNL alleging breach of contract and bad faith for denying her claim. Doc. 1 at 9–12. After Mrs. Dawson filed her complaint, Ratliff met with an in-house attorney for Swiss Re about the lawsuit. Doc. 33-6 at 5–6. Sometime after this conversation, it was determined that the claim should have been paid under a separate conversion privilege in the policy. Doc. 33-2 at 17–18; Doc. 33-6 at 12, 27, 32–33 & 35. There is no evidence in the record relating to the determination that Mrs. Dawson's claim qualified for the conversion privilege or reflecting who made the decision to pay the claim.

Under the policy, the conversion privilege permits an insured person to

"convert the insurance provided under this Policy to an individual policy of life insurance . . . upon termination of insurance due to" a termination of the Member's membership or cancellation of the group policy. Doc. 33-2 at 17.  To qualify for a converted policy, a member or spouse "must submit a written application . . . and pay the first premium due within [31] days after the date his or her life insurance Benefit under this Policy terminates." Doc. 33-2 at 17.  Further, "[i]f an insured person dies during the [31-day] conversion period following termination of insurance under this Policy, the maximum amount of life insurance which he or she was entitled to convert will be paid as a death benefit." Doc. 33-2 at 18.  Ratliff testified that she "missed" Mrs. Dawson's eligibility for the conversion privilege during her initial evaluation of the claim because she never saw an application for the conversion privilege in the claim file. Doc. 33-6 at 32.

On June 7, 2019, JNL issued a check for $100,747.90 to Mrs. Dawson and mailed it to her attorney. Doc. 33-5 at 30–33.  JNL told Mrs. Dawson's attorney that the check "represent[s] payment of the full death benefit on the . . . policy, plus postmortem interest," and "acknowledge[d] that Mrs. Dawson's claim is due to be paid." Doc. 33-5 at 30.  The check was "not offered as a settlement, or in exchange for a release of any claims" asserted in the complaint. Doc. 33-5 at 30.  Mrs. Dawson did not accept or cash the check. Doc. 33-1 at 19.  JNL placed a hold on the check pending the conclusion of this lawsuit. Doc. 42-4 at 152.

9

## III.  DISCUSSION

In her amended complaint, Dawson brings four claims: breach of contract against JNL, bad faith against both defendants, suppression against both defendants, and conspiracy against both defendants. Doc. 21 at 5–8.  Defendants argue that summary judgment is due to be granted on each of Dawson's claims. Doc. 32 at 14–30.  In response, Dawson notified the court that she "does not oppose partial summary judgment on the suppression claims." Doc. 42 at 1.  Accordingly, Defendants' motion for summary judgment as to the suppression claims is due to be granted.  The court addresses the remaining claims below.

### A.    Breach of Contract Against JNL

The insurance policy states that it is "issued in the state of [North Dakota] and is governed by its laws." Doc. 33-2 at 9.  "'Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement.'" *Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So. 2d 1129, 1133 (Ala. 2003) (quoting *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991)).  The court therefore applies North Dakota law to the breach of contract claim.

The elements for a breach of contract claim are: (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach. *Three Acre Props. LLC v. United Rentals (N. Am.), Inc.*, 952 N.W.2d 64, 69 (N.D. 2020)

10

(citation omitted).   The nonperformance of a contractual duty when it is due constitutes a breach of contract. *Id.*

The first element is not in dispute.   As to the second element, Mrs. Dawson alleges in her amended complaint that JNL breached the policy when it refused to pay her death benefit claim. Doc. 21 at 5.   She contends that the policy remained in effect through the entire day of September 15, 2018, such that the policy was still in force when her husband died. Doc. 21 at 5.   JNL largely ignores this allegation in its brief in support of the motion for summary judgment.[4]   A district court does not have the responsibility to distill every potential summary judgment argument from the materials before it. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).   Instead, it is the parties who must present arguments to the court for consideration.   And JNL's only argument directly related to this element is the claim that it did not breach the contract because Mrs. Dawson did not pursue its appeal process and prematurely initiated suit. Doc. 32 at 14–15.   This argument fails for the simple reason that JNL has not identified any policy provision requiring an appeal as a prerequisite to suit.

At any rate, the court finds that JNL breached the contract when it denied Mrs. Dawson's claim.   JNL based its denial on the policy provision stating, "Insurance

---

[4] Instead, the parties address this contention in their bad faith analysis in the context of whether JNL's interpretation of the contract was an arguable reason to deny the claim. Doc. 32 at 20–23; Doc. 42 at 20–23; Doc. 46 at 14–17.

under this Policy will terminate on the earliest of the following dates . . . The next

Premium Due Date following the date the Member attains age 70." Doc. 33-1 at 48.

The question for the court therefore is whether the policy covers the entirety of the

first premium due date after the member turns 70, as Plaintiff contends, or the policy

terminates at 12:01 a.m. on that date, as Defendants contend.  The court finds that

JNL's interpretation of a policy ending at 12:01 a.m. on the premium due date after

Mr. Dawson's 70th birthday is contrary to North Dakota law.

It has long been the law in North Dakota that, "[u]nless the contrary is fixed

by statute, a day extends over the 24 hours from one midnight to the next midnight."

*Husebye v. Jaeger*, 534 N.W.2d 811, 814 (N.D. 1995) (quoting *State v. Richardson*,

109 N.W. 1026, 1029 (N.D. 1906)).  And the Supreme Court of North Dakota has

relied on the opinions of other courts recognizing that the term "day" generally

means the full 24-hour period running from midnight to midnight. *Id.* (citing *Iowa

v. Sheets*, 338 N.W.2d 886 (Iowa 1983); *Thomas v. Dep't of Corrs.*, 430 So. 2d 1153

(La. Ct. App. 1983); *Nelson v. Sandkamp*, 34 N.W.2d 640 (Minn. 1948); *Leach v.

Chu*, 150 A.D.2d 842 (N.Y. 1989); *Meisel v. Piggly Wiggly Corp.*, 418 N.W.2d 321

(S.D. 1988); *Johnston v. Bd. of Trustees*, 661 P.2d 1045 (Wyo. 1983)).  As the

Supreme Court has noted, even Webster's New World Dictionary supports the

proposition that a "'civil or legal day is from midnight to midnight.'" *Id.* (quoting

Webster's New World Dictionary 316 (2d ed. 1982)).

12

The leading treatise on insurance law is in accord with this interpretation. Couch on Insurance states that a fraction of a day "will be disregarded in computing the termination point of an insurance policy, so that a policy which commenced at a certain hour of the day will not, unless expressly provided, terminate at the same hour on the day of expiration but will include the entire day." 7 Couch on Ins., § 102:18 (3rd ed.). Even the common law rule allows that a "day" consists of its full 24 hours and an obligation that must be performed within a certain number of days need not be completed until midnight on the final day. 2 William Blackstone, Commentaries, at 141.

On the great weight of this authority, the court finds that JNL breached the contract when it denied Mrs. Dawson's claim. Under North Dakota law, the insurance contract did not terminate until midnight on September 15, 2018. Because he died at 7:55 p.m., Mr. Dawson was insured at the time of his death.

The parties' core dispute on the breach of contract claim is whether or not Mrs. Dawson was damaged from the breach of the contract. JNL contends that her claim fails "because there are no recoverable damages flowing from the alleged breach." Doc. 32 at 15. More specifically, JNL claims that it tendered Mrs. Dawson the full amount of the policy plus one percent interest, and thus she no longer has any recoverable damages for the alleged breach of contract. Doc. 32 at 15–17. Additionally, JNL contends that Mrs. Dawson cannot recover damages for pain and

suffering or mental anguish on her breach of contract claim. Doc. 46 at 12–13.

The problem for JNL is that the relevant question is whether Mrs. Dawson was damaged by the denial at the time she filed her complaint. Undeniably she was. JNL's post hoc attempt to pay over the amount of the policy plus interest cannot extinguish her claim for breach of contract. This is especially true where the ostensible justification for the payment is unrelated to the provision the defendants are alleged to have breached. JNL's decision to tender the payment and her refusal to accept it should be viewed through the lens of her damages calculation and whether she mitigated her damages.[5] For these reasons, JNL is not entitled to summary judgment on Mrs. Dawson's breach of contract claim.

## B.    Bad Faith

It is undisputed that Alabama law applies to Mrs. Dawson's bad faith claims. She contends that Defendants committed bad faith by denying her life insurance claim without any arguable basis, negligently or recklessly failing to investigate and review her claim, creating their own debatable reason for denying the claim, and relying on an ambiguous portion of the policy in denying her claim. Doc. 21 at 5. Before addressing the merits of this claim, the court finds that there can be no claim

---

[5] Which state's law governs the damages analysis and whether Mr. Dawson is entitled to mental anguish damages also are more appropriately considered to be a function of her damages calculation than as a component of the threshold question of whether she has met her burden of proof as to each element of this cause of action.

for bad faith against Defendant iptiQ because it had no direct contractual relationship with Mr. Dawson or Mrs. Dawson.[6] *Metmor Fin., Inc. v. Commonw. Land Title Ins. Co.*, 645 So. 2d 295, 297 (Ala. 1993) (concluding that "[a]n insurer-insured relationship must exist" for a tort cause of action for bad faith to arise); *Ligon Furniture Co. v. O.M. Hughes Ins., Inc.*, 551 So. 2d 283, 285 (Ala. 1989) ("The tort of 'bad faith' is not a cognizable cause of action in Alabama, except in the context of a breach of an insurance contract, by a party to that insurance contract.") (citations omitted).  Summary judgment will be granted in iptiQ's favor on the bad faith claim. The bad faith claim against JNL, however, will survive.

Under Alabama law, the tort of bad faith "is the intentional failure by an insurer to perform the duty implied by law of good faith in fair dealing." *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981).  A plaintiff can establish the tort of bad faith failure to pay an insurance claim "where there is either '(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'" *St. Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So. 2d 1, 7 (Ala. 1981)). These two scenarios comprise a single tort with slightly different methods of proof.

---

[6] Plaintiff implicitly acknowledges this conclusion but argues that iptiQ is liable for bad faith as a co-conspirator. Doc. 42 at 43.  The court addresses the conspiracy claim separately below.

*Brechbill*, 144 So. 3d at 257–58 ("[T]here is only one tort of bad-faith refusal to pay a claim, not two 'types' of bad faith or two separate torts.") (emphasis omitted). More specifically, the tort of bad faith has four elements (which represent the "normal" case of bad faith), with a conditional fifth element substituted for the normal fourth element in "abnormal" cases of the tort. *Id*. at 258.

To succeed on a normal bad faith theory, a plaintiff must prove (1) the breach of an insurance contract, (2) the refusal to pay a claim, (3) the absence of an arguable reason to deny the claim, and (4) the insurer's knowledge of the absence of any arguable reason. *Id*.  To prevail under the abnormal bad faith method of proof, a plaintiff "must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim," *id.*, not the insurer's knowledge that it did not have an arguable reason for denial.  The purpose behind this method is to deter insurers from relying on willful ignorance as a mechanism for avoiding liability for bad faith. *Steele v. Liberty Ins. Co.*, 2019 WL 4202001, at *1 (N.D. Ala. 2019).  Dawson argues that genuine issues of material fact exist under both methods of proof.  The court agrees.

### 1.    *Absence of an Arguable Reason to Deny the Claim*

Under either method of proof, the plaintiff must establish the absence of a legitimate reason for denying the claim.  "[I]f a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort

of bad faith." *Brechbill*, 144 So. 3d at 258 (citation omitted).  Stated differently, the plaintiff must show that "the insurer lacks a legitimate or arguable reason for failing to pay the claim." *Barnes*, 405 So. 2d at 924.  An arguable reason is a debatable reason—one that is open to dispute or question. *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1992).  As long as the reasoning at the time of the denial was "fairly debatable," an insurer cannot be held liable for bad faith. *Id*.  That is, "when a claim is fairly debatable the insurer is entitled to debate it." *Id*.

JNL contends that Mrs. Dawson's claim fails because it had a legitimate reason for the refusal to pay under two separate termination provisions in the policy. Doc. 32 at 20.  First, JNL points to Ratliff's testimony on the reason for its denial of the claim: "Mr. Dawson attained the age of 70 on September 3, 2018 and the next premium due date after his 70th birthday was September 15, 2018, so based on the policy language, the Policy necessarily expired on September 15, 2018 at 12:01 a.m., prior to his death." Doc. 32 at 21.  As discussed above, this interpretation is contrary to North Dakota law.  It is also contrary to Alabama law since a "day, in contemplation of law, comprises all the twenty-four hours, beginning and ending at twelve o'clock at night." *Robertson v. State*, 43 Ala. 325, 329 (1869).  And it is contrary to reason in as much as JNL's interpretation effectively shifts the timing of the termination from the premium due date to the day before.  Such a forced reading of the contractual language is not a debatable reason to deny coverage.

Second, JNL relies on the "third termination-triggering event" provision that terminates the policy at the "end of the last period for which premiums have been paid." Doc. 32 at 21.  The last payment was made on August 17, 2018, and JNL asserts that "this payment guaranteed coverage through the August-September pay period, which ended at midnight on September 14, 2018." Doc. 32 at 21.  Because there were no further payments, JNL argues that coverage terminated at 12:01 a.m. on September 15, 2018. Doc. 32 at 21–22.

Dawson argues that the court cannot consider this reason because it was not JNL's stated reason for denying coverage. Doc. 42 at 27–28.  Regardless of whether this was JNL's actual reason or a post-litigation justification, JNL has not established that the premium-period rationale is a debatable reason for denying Mrs. Dawson's claim.  Although the policy states that the premiums were due on the 15th day of each month, it is undisputed that the premiums had been drawn from Mrs. Dawson's account between the 17th and 20th of every month since 2014. Doc. 42-3 at 3; *see also* Doc. 46 at 4.  There is no evidence that JNL ever considered Mrs. Dawson's premiums to be late despite this delayed draw down each month.  And JNL was the party in control of the drafts, not Mrs. Dawson.  JNL admits in its reply brief that "the debit date can vary slightly from the due date depending upon calendar processing and other factors." Doc. 46 at 4.  To find under these circumstances that Mrs. Dawson's outstanding premium on September 15, 2018 created a debatable

18

reason for terminating the policy would lead to a perverse result and incentivize insurance companies to delay premium withdrawals so as to create periodic pockets of time in which they would be artificially insulated from paying otherwise qualifying claims.  The court refuses to sanction such a practice.

### 2. *Knowledge of the Absence of an Arguable Reason*

JNL next argues that Mrs. Dawson cannot establish the fourth element of normal bad faith.  Namely, JNL contends that Mrs. Dawson cannot prove "an intentional refusal to pay the claim" and "knowledge [that it lacked a lawful basis for the refusal]." Doc. 32 at 24 (quoting *Acceptance Ins. Co. v. Brow*n, 832 So. 2d 1, 16 (Ala. 2001)).  JNL maintains that the "fact record is completely devoid of any evidence showing that Defendants denied Mrs. Dawson's claim with the actual knowledge that they lacked an arguable basis to do so." Doc. 32 at 24.  The court disagrees.

Mrs. Dawson has created a question of fact as to whether JNL knew it had an arguable reason to deny the claim.  Under the policy, "[a] Member's insurance . . . . will terminate on the earliest of" three pertinent dates: (1) the "end of the last period for which premiums have been paid"; (2) the "next Premium Due Date following the date the Member attains age [70]"; and (3) the date the insured dies.  Doc. 33-2 at 13.  JNL denied Mrs. Dawson's claim based on the second of these dates—the next premium due date following Mr. Dawson's 70th birthday.

In JNL's first letter to Mr. Dawson relating to the termination of his insurance, JNL told him that the policy would "expire on 09/15/2018 with no further benefits." Doc. 33-3 at 1.  The original draft of the denial letter omitted the word "on" and stated that "the policy terminated September 15, 2018." Doc. 42-2 at 2.  Then, McCarty changed the language in the denial letter to insert the phrase "as of" before September 15, 2018.  It is undisputed that the phrase "as of" does not appear in the contract; the policy uses the the word "on."  A reasonable juror could interpret the insertion of the phrase "as of" in place of the policy language as an intentional attempt to change the meaning of the contract in a way that benefitted JNL.  In fact, TerMaat confirmed that the "as of" language was not in the contract but would have meant that coverage terminated on the first second of September 15th. Doc. 42-1 at 20–21.  This manipulation of the language in the denial letter creates a question of fact as to whether JNL knew it did not have a legitimate reason to deny coverage.[7]

### 3.    *Failure to Investigate*

Mrs. Dawson also has created a question of fact under the abnormal method of establishing bad faith.  As explained above, abnormal bad faith adopts the first three elements of normal bad faith but substitutes the conditional fifth element: "the plaintiff must prove the insurer's intentional failure to determine whether there is a

---

[7] The court does not address Dawson's other evidence in support of her argument that JNL knew it did not have an arguable reason to deny the claim (Doc. 42 at 33–35) because the evidence discussed here is sufficient to create a question of fact for the jury.

legitimate or arguable reason to refuse to pay the claim." *Brechbill*, 144 So. 3d at 258 (internal quotation omitted).  In effect, under the abnormal bad faith theory, the court assumes that the insurer knew it had no legitimate reason to deny the claim if it chose not to investigate its decision. *White v. St. Farm Fire & Cas. Co*., 953 So. 2d 340, 348 (Ala. 2006).  A plaintiff succeeds in an abnormal bad faith case by showing (1) an intentional or reckless failure to investigate a claim, (2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, (3) the manufacture of a debatable reason to deny a claim, or (4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. *Id.* at 349.  This theory of bad faith "is akin to deliberate ignorance. The insurer cannot refuse to investigate the claim or stick its head in the sand about it and avoid bad-faith liability by failing to discover whether it had any legitimate or arguable reason to deny a claim." *Cole v. Owners Ins. Co*., 326 F. Supp. 3d 1307, 1330 (N.D. Ala. 2018).

Genuine issues of material fact exist as to whether JNL was deliberately ignorant with respect to Mrs. Dawson's claim.  First, a reasonable juror could find that the insertion of the phrase "as of" into the denial letter was an attempt to manufacture a debatable reason to deny the claim.  As explained above, this language was not in the policy and arguably modified the policy terms to create a reason for denial.  Additionally, there is no evidence that JNL conducted any meaningful investigation into Mrs. Dawson's claim.  Although JNL contends that it "subjected

Mrs. Dawson's claim to the standard review process for claims" (Doc. 32 at 25), the evidence shows that this was not a garden variety claim. Instead, TerMaat, the first person who reviewed the claim, sent an email to confirm her belief that the claim was due to be paid because Mr. Dawson died on the same day the policy expired. Ratliff's response did not answer TerMaat's inquiry, but a few months later Ratliff decided to deny the claim based on the contradicting interpretation of the policy language. There is no evidence that Ratliff engaged in any type of investigation, legal or other research into the policy terms, or consideration of TerMaat's interpretation of the policy. And there is no evidence that Ratliff consulted with anyone other than McCarty, who then inserted non-policy language into the denial letter that strengthened their decision. For these reasons, genuine issues of material fact prevent summary judgment on the claim that JNL committed bad faith under the abnormal method of proof.

## C.    Civil Conspiracy

"Alabama recognizes [civil conspiracy] as a substantive tort." *Purcell Co. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 522 (Ala. 1983). "In essence, civil conspiracy is a combination of two or more persons to do: (a) something that is unlawful; [or] (b) something that is lawful by unlawful means." *Id.*; *see Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988). "In a conspiracy, the acts of coconspirators are attributable to each other." *Ex parte Reindel*, 963 So. 2d 614, 621 n.11 (Ala. 2007).

And although "[a] plaintiff alleging conspiracy must have a valid underlying cause of action," *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000), it is not necessary for each alleged conspirator to be the subject of an underlying cause of action, only for there be a valid cause of action against at least one of the alleged conspirators. *Aliant Bank v. Four Star Invs., Inc*., 244 So. 3d 896, 933 (Ala. 2017) (citing *DGB, LLC v. Hinds*, 55 So. 3d 218, 234 (Ala. 2010)). Because Mrs. Dawson's bad faith claims survive against JNL, so does her claim for civil conspiracy against ipiQ with respect to the underlying bad faith claim. *Id*. ("Because the [plaintiffs] have alleged valid underlying causes of action and because acts of coconspirators are attributable to each other, the [plaintiffs] have stated a claim of civil conspiracy upon which relief may be granted against each of these defendants."). Summary judgment therefore is inappropriate on the civil conspiracy claim.

## IV.  CONCLUSION

Based on the foregoing, it is ORDERED that:

1.     Defendant's Motion for Summary Judgment (Doc. 32) is GRANTED IN PART and DENIED IN PART.

2.     Summary judgment is GRANTED as to Plaintiff's claim for suppression against both defendants and Plaintiff's claim for bad faith against Defendant IptiQ, and these claims are DISMISSED with prejudice.

3.      All other claims remain pending.

DONE and ORDERED on August 12, 2021.

_____

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE